UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| SCOTT MALCOLM and TIM MCGOUGH, as Trustees of the Carpenters & Joiners Welfare Fund, Twin City Carpenters Pension Master Trust Fund, Carpenters and Joiners Apprenticeship and Journeymen Training Trust Fund, and Twin City Carpenters Vacation Fund, and each of their successors,<br><br>                    Plaintiffs,<br><br>v.<br><br>GREGORY HARRIS,<br><br>                    Defendant. | Civil No. 06-2147 (JRT/FLN)<br><br><br><br>**MEMORANDUM OPINION AND ORDER ON CROSS MOTION FOR SUMMARY JUDGMENT** |

Pamela Hodges Nissen, **MCGRANN SHEA ANDERSON CARNIVAL STRAUGHN & LAMB, CHTD.**, 800 Nicollet Mall, Suite 2600, Minneapolis, MN 55402-7035, for plaintiffs.

Bryan R. Feldhaus, Deborah C. Swenson, Margie R. Bodas, and Barry A. O'Neil, **LOMMEN, ABDO, COLE, KING & STAGEBERG, P.A.**, 80 South 8th Street, Suite 2000, Minneapolis, MN 55402, for defendant.

Defendant Gregory Harris is the executive director of Weatherization Research and Production, Inc. ("WRAP"), a Minnesota nonprofit corporation providing weatherization services in the Twin Cities. Plaintiffs Scott Malcolm and Tim McGough

are trustees of several employee benefit funds[1] governed by the Employment Retirement Income Security Act ("ERISA"). Plaintiffs contend that defendant failed to make $375,411.77 in fringe benefit contributions from August 2004 to April 2007, in violation of defendant's obligations under a Collective Bargaining Agreement (CBA). Both parties have moved for summary judgment. For the reasons set forth below, the Court denies the motion for summary judgment filed by the plaintiffs, and grants the motion for summary judgment filed by the defendant.

## BACKGROUND

On August 5, 1998, WRAP became a member of the Carpentry Contractors Association ("CCA"), an association of employers using union carpenters from the Lakes and Plains Regional Council of Carpenters and Joiners ("Union"). As part of its membership agreement, WRAP agreed to be bound by CBAs negotiated between the CCA and the Union. WRAP's CCA membership agreement stated "[t]his authorization will continue until written notification is given to said Association withdrawing this Authorization." (Feldhaus Affidavit, Exhibit G).

On May 1, 2001, a CBA was executed between the CCA and the Union. Pursuant to this CBA, WRAP was required to follow a negotiated wage schedule and to make fringe benefit contributions to the funds represented here by plaintiffs. WRAP was required to demonstrate its compliance with the CBA by providing the plaintiffs with

---

[1] Plaintiffs are trustees of the Carpenters & Joiners Welfare Fund, the Twin City Carpenters Pension Master Trust Fund, the Carpenters and Joiners Apprenticeship and Journeymen Training Trust Fund, and the Twin City Carpenters Vacation Fund.

monthly payroll reports and by cooperating with audits.  The CBA also prescribes the procedures for amending or terminating the agreement.  The CBA states "[a]ny party has the right to terminate or amend this Agreement by giving notice to the other party sixty (60) days before the expiration of this Agreement.  Failure to give such notice shall cause this Agreement to be renewed automatically for a further period of twelve (12) months." (Feldhaus Affidavit, Exhibit H).  The CBA was scheduled to expire on April 30, 2004.

Defendant avers that in April 2004, he informed CCA's executive director that WRAP was withdrawing its membership in the CCA effective immediately.  Then, in a letter dated May 1, 2004, defendant informed plaintiff Malcolm that "with the conclusion of the collective bargaining agreement as of April 30, 2004, [WRAP] will not be renewing its agreement for the future contract period."  (Feldhaus Affidavit, Exhibit I). Meanwhile, a succeeding CBA was negotiated between the CCA and the Union, and executed on August 4, 2004.

Plaintiffs contend that despite this written notice, WRAP's conduct in the months that followed demonstrated its intent to be bound by the August 4, 2004 CBA.  Plaintiffs note that WRAP made payroll reports to the benefit plans' administrator for September, October, and December of 2004, and January, February, and March of 2005.  Plaintiffs also allege that WRAP continued to make "partial" benefit contributions during this time. In addition, plaintiffs allege that WRAP continued to deduct union dues from some employees' paychecks until 2007, and paid those employees in conformity with the CBA

wage schedule. Finally, plaintiffs note that defendant submitted to several of plaintiffs' audit requests.[2]

Defendant contends that WRAP's continuing benefit-related activities were consistent with his view that he could use plaintiffs' funds to continue making benefit contributions on a voluntary basis. Defendant further contends that plaintiffs' communications with WRAP employees demonstrate that plaintiffs understood his situation. Defendant avers that the Union told his employees they would need to make individual contributions if they wished to continue receiving fringe benefits, and would need to individually pay union dues if they wished to continue being treated as Union members. Plaintiffs do not dispute that the Union provided this notice.

Plaintiffs contend that WRAP's benefit obligations under the August 4, 2004 CBA continued through April 2007, and that WRAP failed to make a total of $375,411.77 in required contributions. Plaintiffs allege that under ERISA and the CBA, they are also entitled to liquidated damages in the amount of 10% of the unpaid benefits, $9,067.50 in attorney's fees, $2,627.89 in litigation costs, and an interest payment calculated under terms set in ERISA. *See* 29 U.S.C. § 1132(g)(2). Plaintiffs further argue that defendant is personally liable for these amounts because he was operating WRAP as a sole proprietorship.

---

[2] The Court notes that defendant's compliance with these requests appears to have occurred after plaintiffs commenced litigation. *See* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, at 4-5.

**ANALYSIS**

**I.    STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[3]

**II.   DEFENDANT'S CBA OBLIGATIONS**

A corporation may become bound under a CBA through "conduct manifesting an intention to abide and be bound by the terms of [the] agreement." *Nat'l Labor Relations Bd. v. Int'l Bhd. of Elec. Workers, Local Union No. 22*, 748 F.2d 348, 350 (8th Cir. 1984); *see also Trs. of Atlanta Iron Workers, Local 387 Pension Fund v. Southern Stress Wire Corp.*, 724 F.2d 1458, 1459 (11th Cir. 1983); *Greater St. Louis Constr. Laborers Welfare Fund v. Don Richardson Concrete Co.*, 775 F. Supp. 1249, 1253 (E.D. Mo. 1991). Plaintiffs note that in making this determination, courts have cited a company's continued

---

[3] Because the Court grants the motion for summary judgment filed by defendant, it has viewed the facts in the light most favorable to the plaintiffs.

payment of fringe benefit contributions, *see Don Richardson Concrete Co.*, 775 F. Supp. at 1253; cooperation with a benefit fund audit, *see Brown v. C. Volante Corp.*, 194 F.3d 351, 354-55 (2d. Cir. 1999); and the payment of wages that conform to the CBA pay scale. *See id*. Plaintiffs contend that each of those factors is present here, and that defendant should therefore be considered bound by the August 4, 2004 CBA. Defendant responds that he effectively terminated WRAP's CBA obligations when he withdrew from the CCA in April 2004, and that the conduct cited by plaintiffs was insufficient to create a new binding contract.

The Court agrees that defendant's conduct was insufficient as a matter of law to demonstrate his intent to be bound under the August 4, 2004 CBA. Plaintiffs are correct that other courts have cited to the type of conduct exhibited by defendant in finding the existence of a contract. However, none of those cases involved the sort of advance, unambiguous notice provided here, clearly expressing defendant's intent not to be bound by the relevant CBA.[4] Plaintiffs seek to minimize the significance of this notice by arguing that it was "untimely." However, plaintiffs conceded at oral argument that they provided defendant, a director of a nonprofit corporation, with no notice that his attempted withdrawal from future CBA obligations was ineffective. In addition, plaintiffs do not appear to dispute defendant's testimony concerning the Union notices sent to WRAP employees. Those communications strongly suggest that plaintiffs knew

---

[4] While the defendant in *Don Richardson Concrete Co.* eventually provided notice to the Union seeking to terminate the relevant CBA, this notice came more than one year *after* that CBA was executed, and after the Union had filed its lawsuit seeking unpaid benefits. *See* 775 F. Supp. at 1251-52.

WRAP no longer intended to be bound under the CBA and were adapting to those changed circumstances. Moreover, defendant's notice came more than three months before the August 4 CBA was executed. This suggests that by the time this new agreement was being finalized with the CCA, plaintiffs were well aware of defendant's intentions.

Moreover, the relevant conduct discussed in the cases cited by plaintiff was typically far less ambiguous and irregular than the conduct at issue here. In *Don Richardson Concrete Co.*, the employer continued submitting payroll reports and making fringe benefit contributions for three years after the expiration of the CBA. 775 F. Supp. at 1253. The payroll reports submitted by the employer included a line just above the employer's signature stating "[t]he undersigned employer certifies that it is a signatory to a current collective bargaining agreement." *Id*. In addition, the employer called the Union at the beginning of each contract year to inquire about the new wage and contribution rates. *Id*. In both *Brown* and *Southern Stress Wire Corp.* the employers had each broadly and consistently complied with the terms of the relevant CBA for six years. 194 F.3d at 352 (noting that the defendant had submitted *sixty-one* remittance reports, in addition to cooperating with an audit, paying union wages, and submitting a letter acknowledging its responsibility to contribute to Union funds); 724 F.2d at 1459-60 (noting that during this period the employer had secured nearly all of its employment from the union hall, made fringe benefit reports, paid union trust funds, submitted to Union audits, and paid union wages); *see also Carpenters Fringe Benefit Funds of Ill. v. Able Bros. Constr., Inc.*, 813 F. Supp. 643, 649-50 (N.D. Ill. 1993) (noting that the

defendant was still submitting required contributions and statements fifteen years after the date it alleged its CBA obligations had expired).

Here, plaintiffs point to evidence that defendant submitted payroll reports and "partial" benefit contributions in six non-consecutive months. Even alongside the additional factors cited by plaintiff,[5] this incomplete and sporadic compliance was insufficient to demonstrate that defendant intended to fully "abide and be bound by" the terms of the August 4 agreement, particularly after defendant clearly indicated otherwise in its prior written notice. *See O'Connor Co., Inc. v. Carpenters Local Union No. 1408 of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 702 F.2d 824, 826 (9th Cir. 1983) ("The payment of increased wages and fringe benefits and hiring of the carpenters from the Union hiring hall following complete and unequivocal termination of the 1977-1980 agreement does not indicate consent by the Company to be bound by the new agreement."); *Empire Excavating Co. v. Am. Arbitration Ass'n*, 693 F. Supp. 1557, 1561-62 (M.D. Pa. 1988) ("[P]laintiff's continued use of union members and forwarding of fringe benefit contributions and union dues, without more, does not establish that plaintiff

---

[5] As indicated above, plaintiffs allege that defendant should not have been deducting union dues if WRAP was not bound under the CBA. While the Court has not found sufficient evidence that defendant intended to be bound by the CBA, this does not amount to a finding that any and all deductions made by defendant were appropriate. If defendant improperly deprived employees of portions of their wages, those employees may well have other remedies available. However, such matters are not presently before the Court.

is bound by the 1986-1988 Master Agreement."). Accordingly, the Court grants defendant's motion for summary judgment.[6]

**ORDER**

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 32] is **GRANTED**.

2. Plaintiffs' Motion for Summary Judgment [Docket No. 38] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 31, 2008
at Minneapolis, Minnesota.

s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge

---

[6] Because the Court dismisses plaintiffs' claims, it does not need to reach the question of whether Harris would be personally responsible for WRAP's liabilities. However, the Court notes that Minnesota law on this issue appears clear. This dispute is based on the fact that WRAP, a nonprofit corporation, had been administratively dissolved by the Minnesota Secretary of State in 2002 for failing to file its annual registration. *See* Minn. Stat. § 317A.823, subd. 2(b). Plaintiffs contend that this made defendant a sole proprietorship during the critical events of this case. Under Minnesota law, however, a nonprofit corporation that has been administratively dissolved in that manner can have its corporate status retroactively reinstated by filing a single annual registration. *See* Minn. Stat. § 317A.827, subd. 2. WRAP did so on September 11, 2006. Under Minnesota law, such a reinstatement "validates contracts or other acts within the authority of the articles, *and the corporation is liable for those contracts*." Minn. Stat. § 317A.827, subd. 2(2) (emphasis added); *see Moore v. Occupational Safety & Health Review Comm'n*, 591 F.2d 991, 996 (4th Cir. 1979) (noting that a Delaware statute with language similar to the Minnesota statute absolved directors of personal liability for obligations incurred during a period of administrative dissolution). Accordingly, any CBA liabilities assumed by defendant would have become WRAP's liabilities upon its reinstatement.